**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

Dr. H. Clifford Lane,[1]

Plaintiff,

v.

Robert F. Kennedy, Jr., Secretary,
U.S. Department of Health and Human Services
200 Independence Ave., S.W.
Washington, D.C. 20201;

U.S. Department of Health and Human Services,
200 Independence Ave., S.W.
Washington, D.C. 20201;

Jayanta Bhattacharya, Director,
National Institutes of Health
900 Rockville Pike
Bethesda, Maryland 20892;

National Institutes of Health
900 Rockville Pike
Bethesda, Maryland 20892;

Jeffery Taubenberger, Acting Director,
National Institute of Allergy and Infectious Diseases
900 Rockville Pike
Bethesda, Maryland 20892;

and
National Institute of Allergy and Infectious Diseases
900 Rockville Pike
Bethesda, Maryland 20892,

Defendants.

Case No. _____

---

[1] Dr. Lane resides in Montgomery County, Maryland. In a concurrently filed motion, Plaintiff has requested a waiver of the requirement under Local Rule 102.2(a) to provide his home address in the case caption.

**COMPLAINT**

1.      Plaintiff Dr. H. Clifford Lane is an internationally recognized physician-scientist who devoted his nearly five-decade career to public service at the National Institutes of Health (NIH). But his celebrated and productive career in public health was prematurely cut short when the Trump-Vance administration singled him out for a politically motivated and unlawful termination.

2.      Over the course of his five decades as a public servant, Dr. Lane has led pioneering research and clinical trials to develop treatments for some of the world's most significant infectious diseases. His work helped transform HIV/AIDS from a death sentence into a manageable chronic condition. It paved the way for the approval of life-saving Ebola vaccines and treatment. And it helped establish medical guidelines for treating COVID-19. In short, Dr. Lane's work has literally saved countless lives around the world.

3.      But none of this mattered to the Trump-Vance administration. What did matter, however, was Dr. Lane's association with one of President Trump's perceived political enemies, Dr. Anthony Fauci. Dr. Lane worked closely with Dr. Fauci in the course of achieving some of the federal government's most important medical and scientific advancements.

4.      President Trump and Department of Health and Human Services (HHS) Secretary Kennedy, Jr. have long been explicit in their hostility to Dr. Fauci. Their partisan vendetta against Dr. Fauci has extended to those associated with him like Dr. Lane.

5.      In March 2025, two months after the start of the administration, Dr. Lane was placed on administrative leave from NIH. The administration first told Dr. Lane that he was going to be reassigned, but no new assignment ever materialized. Instead, Dr. Lane was forced to remain on administrative leave for nine months, unable to serve the public, and unable to continue his life-saving work.

6.     Then, in late December 2025, Dr. Lane was abruptly fired. He was not given any reason for his termination, nor was he offered the opportunity to respond. Instead, he was informed of his termination in a three-sentence letter from Secretary Kennedy, who claimed to be acting "[p]ursuant to the U.S. Constitution, Article II, § 2, cl. 2."

7.     Dr. Lane's termination has deprived the world of his life-saving work and research.

8.     The termination was also plainly unlawful. It violated Dr. Lane's statutory and constitutional due process rights. It violated his First Amendment rights because it was based on his perceived political affiliation and his association with Dr. Fauci. And it violated his rights under the Age Discrimination in Employment Act because the termination decision was tainted by unlawful consideration of Dr. Lane's age.

9.     On January 22, 20226, Dr. Lane timely filed a mixed case appeal to challenge his unlawful termination with the U.S. Merit Systems Protection Board (MSPB). As more than 120 days have elapsed without any judicially reviewable action by the MSPB, Dr. Lane now initiates this lawsuit to vindicate his rights.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Dr. Lane's claims under 28 U.S.C. § 1331 and 5 U.S.C. § 7702.

11.     Venue is proper under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e), because at least one Defendant resides in the district, a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are agencies of the United States and officers or employees of the United States acting in their official capacities.

## PARTIES

12.     Plaintiff Dr. Lane is a citizen of the State of Maryland.

3

13. Defendant Robert F. Kennedy, Jr., is sued in his official capacity as the Secretary of the Department of Health and Human Services.

14. Defendant HHS is headquartered in Washington, D.C. and is an agency of the United States within the meaning of 29 U.S.C. § 633(a).

15. Defendant Jayanta Bhattacharya is sued in his official capacity as Director of the NIH.

16. Defendant Jeffery Taubenberger is sued in his official capacity as Acting Director of the National Institute of Allergy and Infectious Diseases (NIAID).

17. Defendant NIH is a component of HHS. NIH is comprised of 27 institutes and Centers, including Defendant NIAID. Both NIH and NIAID are headquartered and maintain their principal offices in Montgomery County, Maryland.

## FACTUAL ALLEGATIONS

### Dr. Lane's 46-year career as an "exceptional" scientist at the NIH

18. Dr. Lane is one of the leading physician-scientists in the United States studying and developing life-saving treatments for infectious diseases. He first started working at NIH in 1979. During his time there, he spearheaded essential research into the biological mechanisms of and treatments for HIV/AIDS, Ebola, Influenza, and COVID-19.

19. Two years after Dr. Lane arrived at NIH, he helped to establish the NIH AIDS research program. Dr. Lane led more than 30 clinical trials that generated critical information about how HIV causes the immune deficiency central to AIDS and how best to treat HIV patients. Dawn O'Connell, the former Assistant Secretary for Preparedness and Response at the

Department of Health and Human Services, said, "When you think about [Dr. Lane's] work, it's the difference between dying from HIV and being able to live with HIV."[2]

20.     Dr. Lane also designed gold-standard clinical trials of experimental Ebola vaccines and therapies in Liberia, Sierra Leone, Guinea, and the Democratic Republic of the Congo, trials which some thought would be impossible to conduct in the extremely challenging circumstances in those countries. Not only did Dr. Lane do so successfully, but this work led to the identification of the first Ebola vaccine and the first two Ebola treatments to receive Food and Drug Administration approval. Former NIH Director Francis Collins, speaking about Dr. Lane's work on these clinical trials under such challenging circumstances, said, "I don't know if there's anybody else on the planet who could have pulled that off. Cliff is the perfect role model of a highly trained physician-scientist who is capable of responding in an emergency situation by the skill of his diplomatic abilities and his determination to get scientific answers that are going to save lives."[3]

21.     More recently, Dr. Lane helped to establish an NIH-led public-private partnership that identified research priorities in responding to the COVID-19 pandemic, worked on a series of clinical trials for patients hospitalized with COVID-19, and helped to set treatment guidelines for the disease. Much like his work on HIV/AIDS and Ebola, his work on COVID-19 has saved countless lives.

22.     In describing Dr. Lane's career, Stewart Simonson, former Assistant Director-General of the New York office of the World Health Organization, remarked, "He is an

---

[2] 2022 Service to America Medals: Paul A. Volcker Career Achievement Medal, *Partnership for Public Service*, available at: https://perma.cc/K2LF-HWSD (last visited May 27, 2026).
[3] *Id.*

5

implementer and a doer. He delivers with integrity and excellent judgment, and a selfless commitment to mission. Cliff is among the finest public servants I have ever encountered."[4]

23.     In 2022, Dr. Lane was awarded the Paul A. Volker Career Achievement Medal. The award is given to one career civil servant in the U.S. government each year by a nonprofit nonpartisan organization.[5]

24.     Unsurprisingly, Dr. Lane's performance evaluations reflected that his work was outstanding. For instance, in recent performance evaluations, Dr. Lane was told that his work was "exceptional in all areas under his purview," his contributions have been "invaluable to NIAID's mission and goals," and that he is a "visionary" who has "consistently delivered over and beyond expectations." In line with the laudatory evaluations he received, Dr. Lane also consistently received the highest performance ratings possible.

**Dr. Lane's position entitled him to statutory due process protections**

25.     Dr. Lane started working at the NIH in 1979. His initial appointment was as a Commissioned Officer in the Public Health Service. In 1982, he was granted tenure as a Senior Investigator.

26.     In 2008, his position was converted from a Commissioned Officer appointment to a special consultant appointment pursuant to 42 U.S.C. § 209(f), a status that provided him with the for-cause removal protections and procedures under 5 U.S.C. § 7513. *See Lal v. MSPB*, 821 F.3d 1376 (Fed. Cir. 2016). Dr. Lane held that appointment, which is in the excepted service, from 2008 until his termination.

27.     Dr. Lane has held several titles throughout his distinguished career at NIH. At the time of his termination, he simultaneously served as: (1) Deputy Director for Clinical Research

---

[4] *Id.*
[5] *Id.*

6

and Special Projects at the NIAID within NIH (since 2006); (2). Clinical Director and Director, Division of Clinical Research (since 2006); and (3) Chief, Clinical and Molecular Retrovirology Section (since 1989).

28.    In these positions, Dr. Lane did not have the authority to approve or deny grants, or make budgetary or policy decisions, nor did he do so.

### Throughout his career, Dr. Lane worked closely with Dr. Fauci

29.    During his multi-decade career at the NIH, Dr. Lane worked closely with Dr. Anthony Fauci, who previously served as Director of NIAID and was Dr. Lane's direct supervisor for several years.

30.    Dr. Fauci and Dr. Lane collaborated on many critically important efforts throughout their careers, including jointly setting up the NIH AIDS research program.

31.    Dr. Fauci served as Dr. Lane's rating official for his performance evaluations from 1986 to 2022, in which he stated Dr. Lane was outstanding and an invaluable asset to the NIH.

32.    Dr. Fauci has publicly praised Dr. Lane, referring to him as "the ideal public servant." Dr. Fauci has also said: "Cliff Lane is the rare combination of a clinician and a brilliant clinical investigator who also plays a major leadership role at NIH.... His work at home and globally has had an enormous impact… To be quite honest, I've never seen anybody like him."[6] These quotes were published online in a video and article in 2022.

33.    In a publicly available scientific article from 2007, Dr. Fauci wrote that Dr. Lane was his "colleague, confidante, and close friend for almost 25 years."[7]

---

[6] *Id*.

[7] Anthony S. Fauci, *A view from Washington through the eyes of an AAP physician-scientist*, The Journal of Clinical Investigation (Oct. 1, 2007), available at: https://perma.cc/P75Q-4T25

34.     Likewise, Dr. Lane has said of Dr. Fauci: "Dr. Fauci is the same now as he was when I first met him — dedicated, hardworking … keeping his eye on the goal, not easily distracted."[8] This quote was published online in 2022.

**The Trump-Vance Administration has long targeted Dr. Fauci and those close with him**

35.     For years, Dr. Fauci and those associated with him, including Dr. Lane, have been the subject of false partisan attacks by President Trump and Secretary Kennedy.

36.     Shortly after taking office in January 2025, President Trump ended Dr. Fauci's federal security detail. But the rhetoric began well before that. For example, President Trump has said: "People are tired of hearing Fauci and these idiots, all these idiots who got it wrong"[9] in reference to COVID-19. Secretary Kennedy has said that Dr. Fauci performed "a historic coup d'etat against Western Democracy"[10] and that "he had a lot of liability on creating coronavirus."[11]

37.     The attacks on Dr. Fauci extended to those close to him, even before the start of the current administration. Dr. Fauci and Dr. Lane were both the subject of false allegations in a document known as "Project 2025," which identified perceived enemies of President Trump based on their political ties with the Democratic party or its perceived values and has served as a

---

[8] Katie Whitney, *This Alum Visited China at the Beginning of the Pandemic*, Michigan Medicine (February 7, 2022), available at: https://www.michiganmedicine.org/medicine-michigan/alum-visited-china-beginning-pandemic.

[9] Maggie Haberman and Michael Crowley, *Trump calls Fauci 'a disaster' and says Americans are tired of virus warnings from 'these idiots.'*, N.Y. Times (Oct. 19, 2020), available at: https://www.nytimes.com/live/2020/10/19/us/trump-vs-biden?action=click&module=Top%20Stories&pgtype=Homepage#trump-fauci.

[10] Adam Nagourney, *A Kennedy's Crusade Against Covid Vaccines Anguishes Family and Friends*, N.Y. Times (Mar 1, 2022), available at https://www.nytimes.com/2022/02/26/us/robert-kennedy-covid-vaccine.html.

[11] Gabrielle M. Etzel, *RFK Jr. says Fauci is likely liable for COVID-19 pandemic*, Wash. Exam. (July 1, 2025), available at: https://www.msn.com/en-us/news/politics/rfk-jr-says-fauci-is-likely-liable-for-covid-19-pandemic/ar-AA1HMbLZ?ocid=BingNewSerp.

blueprint that the Trump-Vance administration has followed. Project 2025 put a spotlight on Dr. Lane as a target of the Trump-Vance administration.

**HHS targeted Dr. Lane and placed him on leave for nine months**

38.    The Trump Administration's first official action to punish Dr. Lane came just over two months after President Trump was inaugurated in January 2025. Despite his outstanding record and life-saving work at NIH, on March 31, 2025, Dr. Lane received an email from Thomas J. Nagy, Deputy Assistant Secretary for Human Resources for HHS, informing Dr. Lane that he was being placed on paid administrative leave effective the next day, and would be prohibited from doing any work while on leave.

39.    The email stated that the leave was the first step of a plan to reassign him to the Indian Health Service, a component of HHS that provides medical and public health services to Native American tribes. Dr. Lane had never previously worked within the Indian Health Service. Dr. Nagy's email did not indicate any reason for the reassignment other than vague statements about promoting the health of the American people.

40.    The email from Dr. Nagy told Dr. Lane to indicate which location he would prefer to be relocated to as part of the reassignment. Each of the proposed locations—which, included, for instance, Alaska and Montana—were extremely far from the Washington, D.C. area, where Dr. Lane lives and spent the majority of his career.

41.    This purported plan to reassign and relocate Dr. Lane was part of an attempt to constructively discharge Dr. Lane, as well as others associated with Dr. Fauci. At around the same time that Dr. Lane was placed on administrative leave, other NIH employees connected to Dr. Fauci were also placed on leave, including Dr. Fauci's wife, bioethicist Dr. Christine Grady.

42.    The March 31 email invited Dr. Lane to direct any questions about his proposed reassignment to Mr. Nagy. Dr. Lane responded on April 2, 2025, with a request to, at the very

least, be reinstated to his roles as Clinical Director and Chief of the Clinical and Molecular Retrovirology Section, because he was responsible for the ongoing care of patients involved in clinical research and his role related directly to ensuring patient safety. He never received a response and was never reinstated to those positions.

43. Instead, in early May 2025, the Agency terminated Dr. Lane's access to his work email without notice.

44. On May 23, 2025, Dr. Lane received a letter from the Office of Human Resources requesting a current copy of his resume in order to "assess your qualifications for a new position in the Indian Health Services."

45. Dr. Lane promptly provided the requested resume and reiterated his request to return to his Clinical Director role so that he could continue his ongoing care of patients, rather than be paid to do nothing on administrative leave. Dr. Lane never received a response. During the nine months that Dr. Lane was on administrative leave, he never received any further communications about the Agency's purported plan to reassign and relocate him.

**After nine months of administrative leave, HHS abruptly and unlawfully fired Dr. Lane**

46. After Dr. Lane spent the better part of a year on administrative leave, his outstanding, nearly 50-year career at NIH came to an abrupt end. On January 2, 2026, Dr. Lane received a letter from Secretary Kennedy, dated December 23, 2025, informing him that he was being terminated effective immediately "[p]ursuant to the U.S. Constitution, Article II, § 2, cl.2." The letter provided no reason for the termination.

47. Dr. Lane, who is over 60 years old, was then replaced by individuals younger than himself. Many of his duties are currently performed by someone in approximately her 40s.

48.    After he was replaced, Dr. Lane learned that Agency leadership repeatedly stated, in reference to Dr. Lane's termination, that the "old guard" was now gone and would not be returning.

**Dr. Lane challenged his unlawful removal at the MSPB**

49.    Dr. Lane timely appealed his termination to the MSPB on January 22, 2026. In his appeal form, Dr. Lane explained that his termination was unlawful because it was not supported by cause, was issued without notice and without following any of the procedures required by 5 U.S.C. § 7513, because age tainted the decision, and because the termination was improperly based on his perceived or actual political affiliation and association in violation of the First Amendment.

50.    As Dr. Lane was raising both a complaint of age discrimination and violations of the Civil Service Reform Act (CSRA), he filed his appeal as a mixed case, pursuant to 5 U.S.C. § 7702.

51.    That same day, the MSPB issued an acknowledgement notice in Dr. Lane's case, instructing him to wait to take any action in his case until the Board decided whether to consolidate his case with other MSPB appeals. The notice prohibited Dr. Lane from contacting the MSPB about his case in the meantime.

52.    Since that time, the MSPB has taken no action in Dr. Lane's case, aside from issuing an order indicating that the case may be dismissed without prejudice pending an MSPB decision in another case.

53.    As more than 120 days have passed since the filing of his appeal, this Court has jurisdiction under 5 U.S.C. § 7702(e)(1) (establishing that, in a mixed case, "[n]otwithstanding any other provision of law, if at any time after . . . the 120th day following the filing of an appeal

with the Board . . . there is no judicially reviewable action . . . an employee shall be entitled to file a civil action").

## COUNT I

### Age Discrimination in Employment Act, 29 U.S.C. § 633a

54. Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

55. Dr. Lane was an employee within the meaning of 29 U.S.C. § 633a(a).

56. The Department of Health and Human Services is an executive agency within the meaning of 29 U.S.C. § 633a(a).

57. Dr. Lane is over sixty years old.

58. Dr. Lane's age tainted the decision to terminate him and replace him with someone who is decades younger.

59. In addition to the age of Dr. Lane's replacement, Agency leadership's celebration of Dr. Lane's termination as having successfully ridded themselves of the "old guard" further indicates that his age played a role in his termination.

60. Dr. Lane suffered damages as a result of his unlawful termination, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT II

### Violation of the Civil Service Reform Act, 5 U.S.C. § 7513

61. Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

62. As an employee appointed under 42 U.S.C. § 209(f), Dr. Lane is entitled to the for-cause removal protections and procedures contained in 5 U.S.C. § 7513.

12

63. The Agency's termination of Dr. Lane did not comply with any of these requirements.

64. The Agency terminated Dr. Lane without cause. Dr. Lane's termination did not include any reason for his termination. Instead, Dr. Lane was terminated due to his age and his perceived political affiliations, which are not permissible reasons to terminate an employee under the CSRA.

65. Further, the Agency terminated Dr. Lane without notice and without following any of the required procedures.

66. For instance, 5 U.S.C. § 7513 requires that, before terminating an employee, an Agency must provide at least 30 days' advance written notice, a reasonable opportunity to answer the charges, to be represented by an attorney, and a written decision listing the specific reasons for their termination. HHS terminated Dr. Lane without following any of these requirements.

67. In addition, the termination constitutes a "prohibited personnel practice" under 5 U.S.C. § 2302(b)(1) and (10) because it was based on Dr. Lane's age, perceived political affiliation, or other irrelevant factors.

68. Dr. Lane suffered damages as a result of Defendants' unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

### COUNT III

### Violation of the Fifth Amendment of the United States Constitution

69. Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

70. Plaintiff raises a claim for injunctive relief under the Fifth Amendment.

71.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

72.     Dr. Lane had a protected property interest in his continued employment with NIH, due to the protections afforded him by the CSRA.

73.     Defendants' termination of Dr. Lane without due process unlawfully deprived him of that property interest.

74.     Dr. Lane has suffered damages as a result of Defendants' unconstitutional conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT IV

### Violation of the First Amendment of the United States Constitution

75.     Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

76.     Plaintiff raises a claim for injunctive relief under the First Amendment.

77.     The First Amendment to the U.S. Constitution protects the right to association for purposes of engaging in speech or other expressive purposes, including political affiliation.

78.     Defendants placed Dr. Lane on leave and terminated him based on his perceived political affiliation and due to his association with Dr. Fauci, whom they viewed as a political rival of President Trump and Secretary Kennedy.

79.     Defendants' termination of Dr. Lane thus violated his First Amendment rights.

80.     Dr. Lane suffered damages as a result of Defendants' unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

14

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1.  Declare that Defendants have violated the foregoing statutes and constitutional amendments;

2.  Order Dr. Lane's reinstatement or, in the alternative, front pay to compensate him for the loss of employment;

3.  Upon reinstatement, enjoin Defendants from withholding any pay and benefits to which Plaintiff is entitled;

4.  Enjoin Defendants from taking any further adverse personnel action against Plaintiff without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

5.  Award make-whole relief for Dr. Lane's termination, including back-pay for salary and benefits;

6.  Award compensatory damages, including damages for emotional distress, reputational harm, and search for work expenses;

7.  Award interest and tax-gross up on the foregoing monetary remedies;

8.  Award reasonable attorney fees, costs, and expenses; and

9.  Award other relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues.

Respectfully submitted,

/s/ Daniel M. Rosenthal
Daniel M. Rosenthal (Bar No. 21101)
Olga M. Thall (Bar No. 18516)
*Charlotte H. Schwartz

15

James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
Fax: (202) 496-0555
omthall@jamhoff.com
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com

*Joshua M. Salzman
*Webb Lyons
Elena Goldstein (Bar No. 31738)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: 202-796-4426
jsalzman@democracyforward.org
wlyons@c.democracyforward.org
egoldstein@democracyforward.org

*Applications and Motions for Pro Hac Vice
Admission to be Filed*

Dated: May 28, 2026                    *Attorneys for Plaintiff*